IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil. No. 05-1521-HO |
| v. | ) ) ) | ORDER |
| GABRIEL PARRA, TONY RODRIGUEZ, Jr., and T.J. HEBERT | ) ) ) | |
| Plaintiff Intervenors, | ) ) ) | |
| v. | ) ) | |
| QWEST CORPORATION, | ) ) | |
| Defendant. | ) ) | |

Plaintiff EEOC alleges that Defendant Qwest discriminated against Plaintiff Intervenors when it disciplined and terminated them on the basis of their national origin. Plaintiff Intervenors each worked as network technicians, driving company vehicles to

service calls throughout the work day.  Defendant Qwest claims that its discipline of plaintiff intervenors ensued after it received a customer complaint alerting Qwest to the presence of a company truck located in front of plaintiff intervenor Tracy Hebert's home during work hours.

The EEOC brings this action alleging that defendant subjected plaintiff-intervenors Gabriel Parra and Tony Rodriguez Jr. to discriminatory discipline and termination based on their national origin (Mexican) and subjected plaintiff intervenor Tracy Herbert to discriminatory discipline and termination based on his association with Parra and Rodriguez in violation of Title VII.[1] Plaintiffs Parra, Rodriguez, and Herbert allege race and national origin discrimination, retaliation for asserting race and national origin discrimination, and  hostile work environment because of race and national origin pursuant to Title VII.  Plaintiffs also allege violation of 42 U.S.C. § 1981 as well as discrimination, retaliation and hostile work environment under state law. Additionally, plaintiffs allege intentional and reckless infliction of emotional distress and wrongful discharge.

Defendant moves for summary judgment contending that plaintiffs cannot make a prima facie showing of discriminatory discharge and that there is no evidence of pretext.  Additionally, defendant contends that the remaining claims fail.

---

[1] Plaintiff intervenors and plaintiff EEOC will be referred to as plaintiffs.

A.    Motions to Strike (Defendant (#213) Plaintiffs (#132))

        The parties have moved to strike hundreds of factual
assertions.   There is of course a lot of hearsay offered as is
often the case in an employment case because hostile environments
often involve statements made by other employees, etc.   However,
hostile environments are not about whether those comments are true,
what matters is whether they were made.   In this case, plaintiffs
offer numerous instances of racist statements and graffiti, and
even vile actions that may not have been witnessed first hand, but
the fact that they occurred is what matters.   However, plaintiffs
falter much of the time even with respect to statements offered not
for the truth because plaintiffs offer statements regarding
different kinds of discrimination alleged by different individuals
about different managers.   Moreover, plaintiffs offer statements
from unspecified sources about unspecified phrases (e.g.,
unidentified co-worker suggested racism or suggesting non-Mexican
is viewed with Mexicans as a group).   Where hearsay statements are
offered, they will not be considered for their truth.   Where
observations are offered, they will not be allowed into evidence
unless the person who personally witnessed them testifies, but to
the extent a witness observes the after affects, that will be
considered as well.   The court declines to grant the motions to
strike at this time, but only admissible evidence will be
considered where offered for the truth of the matter, etc.   Where

relevance objections are made, if the evidence is material to summary judgment, then of course it is relevant. Legal conclusions by witnesses will not be accepted and evidence of other instances of discrimination directed against other employees will only be considered to the extent it demonstrates a hostile work environment with respect to plaintiffs. Of course the court will not consider speculation.

Plaintiffs' motion to strike also raises more substantive issues as well. Plaintiffs want to strike all references to the arbitrator's decision in plaintiff Parra's union grievance as inadmissable hearsay, inadmissable character evidence, and inadmissable expert testimony.

The decision addressed the collective bargaining agreement and not Title VII or section 1981. The arbitrator determined that defendant had just cause to fire Parra. Defendant seeks to use this as evidence of absence of discriminatory intent. The Ninth Circuit has not addressed the issue. Courts are not to defer to arbitral decisions on claims of racial discrimination. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 56 (1974) (policy of deferral by federal courts to arbitral decisions on claims of racial discrimination would not comport with the congressional objective that federal court should exercise the final responsibility for enforcement of equal employment opportunity provisions and would lead to the arbitrator's emphasis on the law

of the shop rather than the law of the land; and fact-finding and other procedures less complete than those followed in a judicial forum). However, the arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate. See id. at 60. The motion to strike it is denied. What weight the evidence will be given is a matter for the summary judgment motion and does not provide a basis for striking the decision.


B.   Summary Judgement

Plaintiffs assert that a hostile work environment existed at defendant's Auction Way Eugene, Oregon facility for more than 10 years. Plaintiffs assert that management knew about severe and pervasive racial and ethnic taunting and allowed an atmosphere of retaliation in response to complaints about racism. Plaintiffs' claims arise out of their termination for conduct they contend was repeatedly ignored when committed by Caucasian workers who did not support the minority workers who complained about the racist environment.

Defendant argues that the terminations resulted from a complaint from a customer on March 4, 2004, regarding plaintiff Herbert spending time at home during work hours and the subsequent investigation that allegedly revealed that plaintiffs visited during company time.

Plaintiffs Herbert, Rodriguez Jr. and Parra were network technicians working out of the Auction Way garage. Their jobs consisted of installing and maintaining the network over which defendant provides telephone service. Plaintiffs drove company vehicles to various locations to conduct such work.

1.   Discriminatory Discharge Claims

Plaintiffs contend that defendant's supervisors explicitly allowed a permissive work culture at the Auction Way garage for years prior to 2004 with regard to out of route and break policies and afterwards, with the sole exception of plaintiffs. Plaintiffs allege that they were the only ones singled out for investigation and termination because they are Hispanic/Mexican (or associated with Hispanics/Mexicans).

Defendant's code of conduct applicable to plaintiffs includes a provision that "No false or misleading entries should be made in any way in any of Qwest's books, records or accounts for any reason, including ... falsifying time reporting." Ex. A to Declaration of David Symes (#85) at p. 14. Plaintiffs and other employees were required "not to leave the job or go out of route (1 mile) in order to take a break." E.g., Ex A. to Declaration of Symes (#85) at p. 17.[2]

_____

[2]Plaintiffs assert issues of fact regarding what constitutes out of route by exaggerating supervisors' knowledge of lack of knowledge of the definition of out of route. For instance, (continued...)

Plaintiffs Parra and Rodriguez are Mexican-Americans, Hispanic, and persons of color. Plaintiff Herbert is an American Caucasian.  Herbert is a close friend with Parra.

On March 4, 2004, one of defendant's customers called regarding plaintiff Herbert:

> An anonymous caller reported to Network Management and Security that an employee had been spending time during the day at home. The caller had seen this behavior for at least a two year period and was upset by the fact it appeared that the employee did not have enough work to do. The caller explained he also witnessed at least two other employees at the residence. He said he felt his bill was too high and it appeared our Technicians did not have enough work.
> ....
> The caller reported his concerns on March 4, 2004 and identified the employee as TJ [Hebert] with an address of 5139 Trevon Street. The caller explained that TJ was off on March 4, 2004, but believed at least two other Techs visited him on that day. The caller said he saw one Qwest vehicle there from about 9:30 a.m. to 10:30 a.m.

Employee Investigation Report (attached as Ex. 46 to the Deposition of Susan Demmin-Beckler (attached as Ex. D to Declaration of David P.R. Symes (#85) at p. 81)).

An investigation ensued and defendant determined, through an investigation conducted by Qwest Security Investigator Susan Demmin-Beckler, that plaintiffs Rodriguez jr. and Parra had visited

---

[2](...continued)
plaintiffs contend that Robert Timmons, plaintiffs' second level supervisor, defined out of route as being 25 miles away from a job. Response (#210 at p. 97).  But Timmons only stated that out of route is a one-mile radius around a particular job.  Timmons further explained that when going from one job to a second job 25 miles away and taking multiple stops in between, for example, he would consider the employee out of route.  See Deposition of B. Timmons at pp. 299-300 (Attached as Exhibit 26H (at p. 46-47) to Third Declaration of Counsel (#199)).

Herbert's house on that or other occasions during work time and that all three had been engaged in longstanding and widespread violations of defendant's code of conduct by falsifying company records to indicate they were working when they were spending excessive amounts of time at Herbert's house or on unauthorized personal business during work hours.

During the investigation Demmin-Beckler claims Parra admitted that he had reported time worked when in fact he was on personal business and that such had gone on for a number of years. Ex. D. to Affidavit of Symes (#85) at p. 54-55. Parra, during an arbitration hearing, contended that from January 5, 2004 to April 18, 2004 he had stopped at Herbert's or his own home for personal business on about 6 occasions but that he had permission to do so. Ex. B to Declaration of Symes (#85) at p. 33. The arbitrator reviewed GPS records and time reports and concluded that Parra visited his own home on more than 30 days (sometimes more than once on the same day), and visited Herbert's home on not less than 13 days during times reported as work.

Herbert and Rodriguez disputed that they reported working on personal time to the extent found by Demmin-Beckler.[3]

---

[3]Herbert and Rodriguez withdrew their grievances regarding the termination following Parra's arbitration and therefore did not proceed to arbitration.

Demmin-Beckler reported her findings to Qwest Director of Network Operations Virginia Callister. On July 14, 2004, Callister terminated plaintiffs Herbert, Rodriguez jr. and Parra.

To establish a discriminatory discharge claim, plaintiffs must demonstrate: (1) that they belong to a class of persons protected by Title VII; (2) that they performed their jobs satisfactorily; (3) that the were discharged; and (4) that defendant treated them differently than similarly situated employees who do not belong to the same protected class as plaintiffs. See Cornwall v. Electra Cent. Credit Union, 439 F.3d 1018, 1028 (9th cir. 2006). Establishing a prima facie case under the McDonnell Douglas framework creates a presumption that defendant undertook the challenged employment action because of the plaintiff's protected status. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). To rebut this presumption, defendant must produce admissible evidence showing that defendant undertook the challenged employment action for a "legitimate, nondiscriminatory reason." Id. If the defendant does so, then "the presumption of discrimination 'drops out of the picture'" and the plaintiff may defeat summary judgment by satisfying the usual standard of proof required in civil cases under Fed. R. Civ. P. 56(c). Cornwall, 439 F.3d at 1028.[4]

---

[4]The same "burden-shifting" analysis applies to both plaintiffs' state and federal discrimination claims. See Snead v. Metropolitan Property & Casualty Insurance Company, 237 F.3d 1080,

(continued...)

Defendant first contends that plaintiffs cannot succeed on their prima facie case because plaintiff Herbert has no associational rights and therefore plaintiffs Rodriguez and Parra cannot establish differential treatment. Plaintiffs cite <u>Drake v. Minnesota Min. & Mfg. Co.</u>, 134 F.3d 878 (7th Cir. 1998) and <u>Johnson v. Univ. of Cincinnati</u>, 215 F.3d 561 (6th Cir. 2000) for the proposition that a mere close friendship is all that is required for associational status for purposes of their discrimination claims. However, in <u>Drake</u>, the Seventh Circuit noted that

> Although we need not decide this issue because 3M has conceded it, we must address 3M's argument that some objectively quantifiable "degree of association" is required in order to state an associational claim. In this context, we note that employment discrimination claims are available to employees of all races, <u>see McDonald v. Santa Fe Trail Transp. Co.</u>, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), so long as the discrimination is "because of such individual's race". 42 U.S.C. § 2000e-2(a)(1). Accordingly, we believe that the key inquiries should be whether the employee has been discriminated against and whether that discrimination was "because of" the employee's race. [Footnote 3 omitted] Contrary to 3M's assertions, we do not believe that an objective "degree of association" is relevant to this inquiry.
>
> Reviewing the evidence in the record, we conclude that neither of the Drakes established an inference that they were subjected to a hostile work environment because of their race. With respect to Mr. Drake, he has not established an inference that any harassment to which he was subjected was based on his race, in conjunction with his association with Hawkins and Anthony.

---

[4] (...continued)
1092-93 (9th Cir. 2001), (<u>McDonnell Douglas</u> burden-shifting scheme is federal procedural law, not substantive law, and applies to both federal and Oregon employment discrimination claims).

10 - ORDER

<u>Drake</u>, 134 F.3d at 884.  Thus, the associational status was not an issue in the case.

In <u>Johnson</u>, the court found that

> Plaintiff need not have alleged discrimination based upon his race as an African American in order to satisfy the protected status requirement of his claims. Indeed, in light of this Court's holding in <u>Tetro</u> and <u>Winston</u>, the fact that Plaintiff has not alleged discrimination because of his race is of no moment inasmuch as it was a racial situation in which Plaintiff became involved-Plaintiff's advocacy on behalf of women and minorities in relation to Defendant's alleged discriminatory hiring practices-that resulted in Plaintiff's discharge from employment. See <u>Tetro</u>, 173 F.3d at 994-95; <u>Winston</u>, 558 F.2d at 1268; <u>see also Parr</u>, 791 F.2d at 892 (holding that "[w]here a plaintiff claims discrimination [in a Title VII action] based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of his race").  Although obviously not anticipated by the district court's flawed reasoning, it is clear that a Caucasian high-level affirmative action official could bring a claim under § 1981 and § 2000e-2(a) for discrimination based upon his advocacy on behalf of minorities because the discrimination would be "because of such individual's race," where the race of the minorities for which he was advocating would be "imputed" if you will to the Caucasian high-level affirmative action official.  <u>See Tetro</u>, 173 F.3d at 995.

<u>Johnson</u>, 215 F.3d at 575.  However, this is not an advocacy case, it is an association by friendship case.

Although the Ninth Circuit has yet to address the issue, the law requires something more than just friendship.  <u>See, e.g.</u>, <u>Robinett v. First Nat. Bank of Wichita</u>, 1989 WL 21158, *2 (D.Kan Feb. 1, 1989):

> Many courts have recognized a cause of action against an employer for discrimination due to one's association with minorities under Title VII of the Civil Rights Act of

1964 and 42 U.S.C. § 1981. <u>See</u> <u>Reiter v. Central</u> <u>Consolidated School District</u>, 39 F.E.P. cas. 833 (D.Colo.1985) (Title VII) and <u>Winston v. Lear-Siegler,</u> <u>Inc.</u>, 558 F.2d 1266, 1270 (6th Cir. 1977) (section 1981). To maintain a claim of discrimination or harassment based on her association with a black person, plaintiff must show the existence of an association. The law requires something more than mere work-related friendship. **There must be a significant connection between the plaintiff and the non-white person**. <u>See</u> <u>Skinner v. Total Petroleum,</u> <u>Inc.</u>, 859 F.2d 1439, 1447 (10th Cir. 1988) (white plaintiff may bring a section 1983 claim of retaliatory discharge based on his support of discharged black co-worker in bringing an EEOC charge against employer), <u>Gresham v. Waffle House, Inc.</u>, 586 F.Supp. 1442, 1445 (N.D.Ga.1984) (interracial marriage); <u>Winston</u>, supra (plaintiff protested the discriminatory discharge of a black co-worker); <u>Smithberg. v. Merceo, Inc.</u>, 38 F.E.P. cas. 1868 (C.D.Cal.1983) (plaintiffs attempted to vindicate minority employees' rights).

In the present case, plaintiff fails to provide sufficient evidence to establish an association with Ms. Moore to maintain actions under Title VII and section 1982 based on association. The association between plaintiff and Ms. Moore was that of co-workers who had a good friendship at work. Plaintiff, as head teller, worked with Moore, a teller, about her work-related problems. The court accepts as true plaintiff's allegations that she was more supportive and provided more assistance to Ms. Moore than any other white employee at the Bank's west branch. Although plaintiff was very supportive of her black co-worker, this is insufficient to establish the type of relationship between whites and non-whites necessary for a white person to maintain a cause of action of discrimination based on association. **Plaintiff provides no evidence that she actively attempted to vindicate Ms. Moore's rights or protested against any discrimination against Ms. Moore.**

(emphasis added).

In this case, plaintiffs offer evidence that Herbert socialized with Parra and that he asked Parra to check on his ailing wife. Plaintiff also contends that Herbert wrote a

statement in support of a discrimination claim brought by Parra and other Hispanic techs at the Auction Way garage (See Exhibit 62 (#115) attached to First Deceleration of Counsel (#96)), but Herbert stated that he did not send the statement to anyone in the company.    Herbert Deposition at p. 229 (attached as Ex. 1 to Declaration of Cody Weston (#219)).    Moreover, the statement appears to be more of a complaint about supervisor Chris Seubert's management style rather than race issues.    See Ex. 62 (#115) attached to declaration of Counsel ("Chris is in my opinion a user and once he is done with you, he cuts you loose and it doesn't matter if someone's job is on the line.")    But note that the statement also relates that "I have been friends with [Parra] for a while and Chris would tell me that 'if I wanted to stay out of trouble, that I should stay away from the Rodriguez clan."    In addition, there is no evidence that the decision maker in this case, Virginia Callister, was aware of even a friendship between Herbert and Parra and Rodriguez.

The alleged relationship between Herbert and Parra does not rise to a level sufficient to invoke a claim of associational discrimination based on race.    See Zielonka v. Temple University, 2001 WL 1231746 (E.D.Pa. Oct. 12, 2001) (association with African American professor with whom plaintiff voted in an academic election for department chair):

> Plaintiff did not have the type of relationship with Dr.
> Roget that alone may reasonably support an assumption

that plaintiff's race motivated the action he complains
of. The cases in which courts have recognized a cause of
action under Title VII have typically involved more
substantial relationships. <u>See Parr</u>, 791 F.2d at 892
(interracial marriage); <u>Chacon v. Ochs</u>, 780 F.Supp. 680,
682 (C.D.Cal.1991) (interracial marriage); <u>Gresham</u>, 586
F.Supp. at 1445 (interracial marriage); <u>Holiday</u>, 409
F.Supp. at 908 (interracial marriage); <u>Clark v. Louisa
County School Board</u>, 472 F.Supp. 321 (E.D.Va.1979)
(interracial marriage). <u>See also Robinett v. First Nat'l
Bank of Wichita</u>, 1989 WL 21158, *1-2 (D.Kan. Feb. 1,
1989) ("good friendship" of white plaintiff with black
co-worker "insufficient to establish the type of
relationship" necessary to support cause of action).

Plaintiff has not presented any competent evidence that
he actively attempted to vindicate Dr. Roget's rights or
protested against discrimination directed toward him.
[footnote omitted] It appears that plaintiff's
relationship with Dr. Roget was that of friendly
acquaintance and supportive voter in an academic
election.

Accordingly, the court grants summary judgment as to Herbert's

claims of discriminatory discharge as he does not belong to a

protected class.  In addition, because Herbert is a similarly

situated employee who is not a member of the same protected class

as Parra and Rodriguez and who was also terminated for the same

conduct, plaintiffs' fail to establish a prima facie case for

discriminatory discharge and the claims are dismissed.[5]

---

[5]In addition, while plaintiffs attempt to show that other
similarly situated non-Hispanic employees were not treated the same
with respect to being out of route, plaintiffs fail to provide
sufficient evidence that others engaged in similar conduct and were
not disciplined as they were.  In other words, plaintiffs have not
shown that Callister was aware of others who so blatantly violated
the false reporting and out of route rules other than to offer
various statements they attribute to others that employees
routinely go out of route.  At best, plaintiffs offer a situation
in which Troy Olsen was caught being out of route, referred for
discipline, determined to have been out of route two times during
a two week period and suspended for seven days.    This incident
(continued...)

2.   National Origin Discrimination under section 1981

Plaintiffs allege that "Qwest discriminated against Plaintiffs on the basis of ... race, national origin, and color in the performance of ... employment ... , and in the enjoyment of all benefits, privileges, and terms, and conditions of the contractual relationship all in violation of 42 USC § 1981."  Defendants move to dismiss the national origin discrimination claim under section 1981.  To establish a claim under section 1981, plaintiffs must prove that they were subjected to intentional discrimination based upon race, rather than solely on the basis of the place or nation of their origin. See St. Francis College, 481 U.S. 604, 613 (1987). To the extent plaintiffs raise section 1981 claims based on national origin discrimination, the claims are dismissed.

3.   Race Discrimination

Plaintiffs' EEOC charges checked only the "national origin" box and did not check the "race" box.  The EEOC charges do not make

----

[5](...continued)
occurred after Callister left and after plaintiffs were terminated. Plaintiffs on the other hand, even accepting their facts, were out of route on numerous occasions. Moreover, plaintiffs' attack on the GPS records, and the investigation methodology are insufficient to demonstrate anything less than significant and numerous occasions in which they were out of route. Plaintiffs fail to demonstrate that other employees were out of route to such an excessive degree as they were. Plaintiffs offer some limited support for Caucasian techs who may have been out of route (generally just some word of mouth type evidence) and not referred to security, but nothing approaching the degree of their activities and no similar complaints from customers to launch security investigations. Further, the dirt plaintiffs sling regarding sexual harassment, auto accidents, and stalking are not relevant and generally not supported with admissible evidence.

references to race.  The EEOC limited its claims in this case to national origin discrimination.  Consequently, defendant seeks summary judgment asserting that plaintiffs failed to exhaust their administrative remedies regarding race discrimination.

To establish federal subject matter jurisdiction, plaintiffs are required to exhaust their EEOC administrative remedies before seeking federal adjudication of their claims.  See Sosa v. Hiraoka, 920 F.2d 1451, 1456 (9th Cir. 1990).  The scope of a Title VII court action depends upon the scope of both the EEOC charge and the EEOC investigation.  Id.

Plaintiffs contend that although the EEOC charges did not charge race discrimination, the race discrimination claims should be allowed now because such claim could reasonably be expected to grow out of the complaint alleging national origin discrimination. See EEOC v. Farmer Bros. Co., 31 F.3d 891, 899 (9th Cir. 1994) (discriminatory layoff claim was like and reasonably related to allegations of discriminatory failure to recall and rehire set forth in EEOC charges).  Plaintiffs contend that defendant's response to the EEOC charges demonstrate that it thought the claim was one for race discrimination.  However, The EEOC charges in this case did not reference race discrimination.  In Sosa, for example, although not all claims were listed in the EEOC charge, the factual detail in the charges did reference all claims.  The failure to include facts in th EEOC charge in this case demonstrates that

plaintiffs did not exhaust their race discrimination claims. See Encinas v. Tucson Elec. Power Co., 76 Fed. Appx. 762, 765 (9th Cir. 2003). The motion for summary judgment is granted as to the race discrimination claims.


    4.   Retaliatory Discharge

    Plaintiffs allege that they were discharged in retaliation for complaining about unlawful discrimination. To establish a prima facie case of retaliation, plaintiffs must show that (1) they engaged a protected right; (2) they were adversely affected by an employment decision (e.g., discharged);[6] and (3) there is a causal connection between the two actions. See Morgan v. Hilti, 108 F.3d 1319, 1325 (10th Cir. 1997); Manatt v. Bank Of America , N.A., 339 F.3d 792, 797 (9th Cir. 2003). If plaintiffs meet that burden, the burden-shifting framework for analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973), applies.

    Defendant contends that there is no evidence that Herbert engaged in protected activity, that the decision maker (Callister) was not aware of any protected activity by any plaintiffs, and that there was a significant time period between Rodriguez Jr.'s BOLI complaint and his termination. Additionally, defendant contends

---

    [6]Plaintiffs argue that there were other instances of adverse employment actions, but the allegations of accusations of cheating, accusation of driving too fast, starting rumors, changed routes, etc. do not amount to adverse actions and many alleged actions are not timely.

17 - ORDER

that it had a legitimate reason for terminating plaintiffs because of their significant out of route activities for which they reported they were working.

Plaintiffs contend they made informal complaints to supervisors on numerous occasions. Plaintiffs also state that they filed multiple internal EEO complaints of which Callister was aware and that others were involved in the termination decision. Plaintiffs also contend that there is evidence from which a fact-finder could conclude that the proffered reason for the termination was a pretext.

Plaintiffs' evidence that Callister was aware of the complaints of discrimination is weak at best. They contend she interacted with other managers, but this does not demonstrate that those others communicated that plaintiffs made complaints. Callister testified that she did not get any specific information regarding Rodriguez Jr.'s complaints, but she does acknowledge that she may have heard something in passing. See First Declaration of Counsel (#96) at Ex. 5 (#99), p. 12 (Callister Depo. at p. 55-57). Callister specifically states that she was not aware that he was complaining about discrimination or harassment. See id. at p. 11. Callister similarly recalls that union grievances were filed, but does not recall what they were about. However, Callister did state the EEO would giver her a courtesy call regarding complaints, but that they did not always do that. Nonetheless, she does note an

overview may have been given regarding a Parra complaint (despite lack of memory of it). Id. at p. 26. The link to Callister regarding complaints is weak, but perhaps sufficient to show a prima facie case.

Plaintiffs however, do not direct the court to the "evidence from which a reasonable trier of fact could conclude that defendants's proffered non-discriminatory reasons for terminating [plaintiffs] are pretextual." Response (#210) at p. 120-21.[7] Plaintiffs factual background is 94 pages long and their brief is 134 pages long. The court has no duty to search the documents and the record to find the evidence and references to it. Despite plaintiffs' protestations regarding the investigation, faulty GPS equipment, destruction of records, failure to allow plaintiffs to see records, etc., it would be unreasonable for a trier of fact to conclude that plaintiffs did not violate the out of route policy and did not falsify their time records numerous times over a long period of time. This coupled with the weak evidence regarding Callister's knowledge of the complaints of discrimination demonstrates that granting summary judgment on the retaliation claims is appropriate. The evidence does not establish that anyone

---

[7]But see, P. 102 (referral to security when no one else was referred, unreliable data (unsupported by plaintiffs' evidence), denied opportunity to respond because denial of access to records, delayed decision to allow GPS and time records to age off the system). Plaintiffs do not present sufficient evidence that Callister was aware of any flaws in the security referral or the investigation and plaintiffs evidence of "math errors" and faulty GPS is insufficient.

other than perhaps Vice President Randy Hagedorn had a hand in the ultimate decision to terminate.[8]  The evidence that plaintiffs may appropriately rely on does not establish  that the reason relied on by the decision makers was a pretext for discrimination or retaliation for discrimination.


5.    Hostile Work Environment

Plaintiffs allege claims for hostile work environment based on national origin and race. To prevail on this claim, plaintiffs must show: (1) that they were subjected to verbal or physical conduct because of their race or national origin; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment. See Gregory v. Widnall, 153 F.3d 1071, 1074 (9th Cir. 1998).  The required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.  Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463, n.4 (9th Cir. 1994).

Plaintiffs allege numerous instances of offensive conduct over a long period of time.  Much of the alleged conduct occurred outside the 300 days before the EEOC complaint for purposes of the federal claims and outside one year for purposes of the state law

---

[8]Plaintiffs argument that the decision to refer them to investigation demonstrates retaliation does not negate the fact that Callister honestly believed the resulting outcome of the investigation.

claims.[9]  Moreover, plaintiff Rodriguez Jr. did not bring his complaint within the 90 days after his right to sue notice was given negating his state and federal claims, but Rodriguez Jr. also filed a second EEOC complaint and did timely sue after a right to sue letter for that complaint was issued.

Plaintiffs contend all conduct is actionable because of the continuing violation doctrine.  The vast majority of alleged conduct occurred prior to September 2001 (to the extent plaintiffs give dates at all).  The earliest possible time period is December 22, 2001.  A charge alleging a hostile work environment claim will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.  See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002).  Moreover, a court may apply equitable doctrines that may toll or limit the time period. See id.  If the conduct that pre-dates the timely conduct has no relation to the timely conduct, however, then the employee cannot recover for the previous acts.  Id.

Plaintiffs, for the most part, offer general and often unattributable instances of offensive conduct by co-workers, but also some attributable to supervisors.  See Response (#210) at pp. 126-28.  Some instances do not appear to involve race or national origin, but there are many racial epithets and slurs.  As noted,

[9]In addition, race claims under section 1981 go back four years.

most instances were prior to December 2001.  Alleged timely actions
include accusations of drug dealing, a cup of salsa with the word
"Mexican baby food" written on it placed in Parra's truck by an
unknown person, shunning and refusal to help plaintiffs, racist
messages on a pager from an unknown person, and "Taco, Jr." written
on various terminals by an unknown person.  The pre and post
December 2001 conduct do appear to have at least some connection
because both involve racial epithets.  The conduct, however,
involves different supervisors, a significant time lag between the
two sets of conduct, and there appear to be no supervisor offensive
comments in the post December 22, 2001 period.  Nonetheless, the
pre and post acts appear plausibly related to each other sufficient
to invoke the continuing violation doctrine.

Hostile work environment claims do not provide causes of
action for incivility.  See Manatt,  339 F.3d at 798 (Section 1981,
like Title VII, is not a "general civility code.").  Simple
teasing, offhand comments, and isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the terms and
conditions of employment.  Id.  Plaintiffs do not offer any
physical threats and for the most part offer sporadic offensive
utterances spread out over a number of years.  Moreover, plaintiff
Herbert offers virtually no instances of being subject to hostile
work environment and he cannot point to conduct based on race in
support of his claims.

The working environment must be both subjectively and objectively perceived as abusive. <u>Harris v. Forklift Sys., Inc.</u>, 114 S.Ct. 367, 370 (1993). Whether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics. <u>Cf</u>. <u>Ellison</u>, 924 F.2d at 879. Hostility must be measured based on the totality of the circumstances. <u>Harris</u>, 114 S.Ct. at 371.

> These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

<u>Id</u>.

The hostile work environment is mostly based on merely offensive conduct and the frequency is somewhat limited. Nonetheless, plaintiffs Parra and Rodriguez Jr. shall be allowed to go forward with these claims. The motion for summary judgment is granted as to plaintiff Herbert, however.

6.    <u>Intentional and Reckless Infliction of Emotional Distress</u>

Regardless of whether a claim for reckless infliction of emotional distress exists, both claims for emotional distress do not survive summary judgment because of the lack of extreme and outrageous conduct.

To prevail on an intentional infliction of emotional distress claim, plaintiffs must demonstrate that (1) defendant intended to inflict severe emotional distress, (2) defendant's acts were the cause of plaintiffs' severe emotional distress, and (3) defendants' acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. McGanty v. Staudenraus, 321 Or. 532, 543 (1995).

The intent element of IIED is satisfied not only where the actor desires to inflict severe emotional distress, but also where he knows that such distress is certain, or substantially certain to result from his conduct. McGanty, 321 Or. at 550.

The Oregon Supreme Court has noted that the duty to refrain from abusive behavior in the employment relationship comes close to that of the physician toward a patient. Hall v. The May Department Stores Co., 292 Or. 131, 138 (1981). Thus, the employment relationship may impose a more demanding obligation to refrain from inflicting mental and emotional distress. See id. The consideration of the relationship between the alleged tortfeasor and the alleged victim is relevant to the inquiry regarding the conduct element. See Rockhill v. Pollard, 259 Or. 54, 63 (1971).

It is for the trial court to determine, in the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. If the minds of reasonable men would not differ on the subject, the court is

obliged to grant summary judgment. <u>Pakos v. Clark</u>, 253 Or. 113, 132 (1969).

Various factors bear upon the offensiveness of the conduct, including whether a special relationship exists between the defendant and the plaintiff, such as that of physician-patient, counselor-client, or common carrier-passenger. <u>Williams v. Tri-County Metropolitan Transportation District of Oregon</u>, 153 Or.App. 686, 689-90 (1998); <u>Erickson v. Christenson</u>, 99 Or.App. 104, 107, rev dismissed 311 Or. 266 (1991). Other factors include whether the conduct was undertaken for an ulterior purpose or to take advantage of an unusually vulnerable individual. <u>See</u> <u>Checkley v. Boyd</u>, 170 Or.App. 721 (2000). The setting in which the allegedly outrageous conduct occurs--for example, in a public venue or within the employment context--also can bear on the degree of offensiveness of the conduct. <u>See, e.g.</u>, <u>Hall</u>, 292 Or. at 137; <u>Trout v. Umatilla Co. School Dist.</u>, 77 Or.App. 95, 102 (1985).

"Oregon cases which have allowed claims for intentional infliction of emotional distress to proceed typically involve acts of psychological and physical intimidation, racism, or sexual harassment." <u>Garrison v. Alaska Airlines, Inc.</u>, Civil No. 98-433-KI, Opinion by Judge King dated June 17, 1999, p. 8.

The mere fact that an employer overworks employees, makes unreasonable demands upon them, and is otherwise less than a model employer does not by itself constitute an extraordinary

transgression of the bounds of socially tolerable conduct under Oregon law. Cf Madani v. Kendall Ford Co., 312 Or 198, 203-06 (1991) (terminating employee for refusing to pull down his pants); Patton v. J.C. Penney Co., 301 Or 117, 124 (1986) (employee terminated because he refused to stop dating co-worker); Watte v. Edgar Maeyens, Jr., M.D., P.C., 112 Or.App. 234, 237 (1992) (employer threw a tantrum, screamed and yelled at his employees, accused them of being liars and saboteurs, then fired them all); Snyder v. Sunshine Dairy, 87 Or.App. 215, 218 (1987) (inconsistent and excessive supervision, unjustified reprimands, threats of termination, requiring the employee to perform menial tasks). See also Wells v. Thomas, 569 F.Supp 426, 433 (E.D.Pa. 1983) (placing plaintiff in newly created position without responsibilities, taking away her private office, reassigning her secretary, allowing her phone calls to go unanswered, giving her poor performance evaluations for the first time in 25 years, and terminating her); Beidler v. W.R. Grace, Inc., 461 F.Supp 1013 (E.D.Pa. 1978), aff'd 609 F.2d 500 (3rd Cir. 1979) (plaintiff excluded from meetings necessary to perform his job, found papers constantly rearranged on his desk to annoy him, informed he would be given a new assistant without consultation, learned from rumors that his job was in jeopardy, and evaded by his superior who intimated that the new assistant would be replacing him).

The allegations in this case are not enough to demonstrate an extraordinary transgression of the bounds of socially tolerable conduct.  Moreover, with respect to the intentional infliction claim, there is insufficient evidence that defendants desired to inflict severe distress or knew that it was substantially certain to occur.  Accordingly, the motion for summary judgment is granted as to plaintiffs' intentional and reckless infliction of emotional distress claims.

### 7.   Wrongful Discharge

Plaintiffs allege that they were wrongfully discharged because they opposed discrimination.  Generally, in the absence of a contract or legislation to the contrary, an employer can discharge an employee at any time and for any cause.  Conversely, an employee can quit at any time for any cause.  <u>Nees v. Hocks</u>, 272 Or. 210, 216 (1975).  But, there can be circumstances in which an employer discharges an employee for such a socially undesirable motive that the employer must respond in damages for any injury done.  <u>Id</u>.  An employer commits the tort of wrongful discharge when it terminates employment for exercising a job-related right, for complying with a public duty or for performing an important obligation in the public interest.  <u>Sheets v. Knight</u>, 308 Or. 220, 230-31 (1989) (abrogated on other grounds <u>McGanty v. Staudenraus</u>, 321 Or. 532 (1995)).

To prevail on a claim for wrongful discharge plaintiffs must prove that they were discharged and that the discharge was wrongful. <u>Moustachetti v. Oregon</u>, 319 Or. 319, 325 (1994). Plaintiffs must show a causal connection between the exercise of the employment-related right and the adverse employment action. <u>Shockey v. City of Portland</u>, 837 P.2d 505, 509-10 (Or.1992). The motion for summary judgment is granted on this claim for the same reasons that it is granted as to the retaliation claim above.


<u>CONCLUSION</u>

For the reasons stated above, defendant's motion for summary judgment (#189) is granted in part and denied in part. In addition, the motions to strike (#s 132 and 213) are denied.

DATED this ___22nd___ day of May, 2008.

___s/ Michael R. Hogan___
United States District Judge

28 - ORDER